UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
LOCAL 100, TRANSPORT WORKERS
UNION OF GREATER NEW YORK,

                Plaintiff,                03 Civ. 3512 (PKC)

      -against-

TRANSPORT WORKERS UNION OF AMERICA,      MEMORANDUM
                            AND
            Defendant.              ORDER
--------------------------------------------------------------x

P. KEVIN CASTEL, U.S.D.J.

        This is an action by Local 100, Transport Workers Union of Greater New York

("Local 100"), a local labor union, against the Transport Workers Union of America

("TWU"), which Local 100 describes as "its parent national union." (Complaint ¶ 1) This

Court has jurisdiction over the subject matter of this suit by reason of section 301 of the Labor

Management Relations Act ("LMRA"), 29 U.S.C. § 185.

        The president of Local 100 is Roger Toussaint, who was elected in December

2000 in an independently monitored election. Touissaint ran as part of the "New Directions"

slate of candidates. The president of the TWU is Sonny Hall, who is a former president of

Local 100. According to the Complaint, the leadership of Local 100 is "politically opposed"

to the leadership of the TWU. (Complaint ¶ 1)

        In this lawsuit, Local 100 challenges four separate decisions of the TWU or its

internal appellate apparatus. Each of the four decisions is alleged to state a separate claim for

violation of the TWU Constitution.

Defendant now moves for summary judgment on the ground that no reasonable jury could find that the TWU's decisions were patently unreasonable or made in bad faith, which it asserts is the governing standard. Defendant also contends that this case is moot to the extent that it concerns three of the four appeals. Plaintiff moves for summary judgment on the ground that the only conclusion that a reasonable fact-finder could reach is that TWU's decisions were patently unreasonable. Plaintiff alternatively contends that there is a genuine dispute of material fact as to whether defendant's decisions were made in bad faith.

For the reasons set forth below, I grant summary judgment in favor of the defendant.

I.    BACKGROUND

Defendant TWU is a national labor organization with affiliates in the public and private transportation industries. Local 100 is a local constituent of the TWU, representing public and private sector employees in the transportation industry in the New York metropolitan area. Its largest constituency is the 34,000 operations and maintenance employees in the bus and subway divisions of the New York City Transit Authority. Because of its large membership, Local 100 is divided into a number of divisions that reflect the operating divisions of the Metropolitan Transportation Authority and the Manhattan and Bronx Surface Transit Operating Authority.

The New Directions group was founded in 1986 at a time when Local 100 was headed by the individual who is now the incumbent president of the TWU, Sonny Hall. New Directions sought to field candidates for election to union offices, and by December 1991, had won ten of the 33 positions on Local 100's Executive Board. In the December 2000 election, New Directions candidates won approximately two-thirds of Executive Board positions.

Sonny Hall, who served as President of Local 100 from 1985 to 1993, was elected President of the TWU in 1993. Plaintiff describes Hall as "part of a political machine which controlled Local 100 since . . . 1966." (Toussaint Decl. ¶ 2) Supporters of Toussaint and supporters of Hall have long been at odds and are no strangers to the federal courts. See e.g., Schermerhorn v. Local 100, Transport Workers Union of America, AFL-CIO, 91 F.3d 316 (2d Cir. 1996); Toussaint v. Hall, 02 Civ. 6403(PKC); TWU v. Local 100, 04 Civ. 5210 (LAK); Mack v. Transport Workers Union of America, 2002 WL 500377 (S.D.N.Y. Mar. 29, 2002).

The relationship between Local 100 and the TWU is determined by the TWU's Constitution, and the rights of the union's members are set forth in the Constitution and in the Local's by-laws. Under the Constitution, the TWU's International Committee on Appeals (also known as the "International Appeals Committee" and apparently referred to by both parties as the "IAC") has "the power to decide all appeals from Local Unions and their members in any matter relating to the application of this Constitution or the By-Laws of the Local Union." (Article XXII, section 1)

This lawsuit was filed on May 16, 2003 and reassigned to me on December 2, 2003. Section 301 of the LMRA has been construed to confer jurisdiction on a district court to entertain a suit by a local union against its international parent for violation of the parent's constitution. See United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Industry v. Local 334, 452 U.S. 615 (1981). The union's constitution is deemed to be a contract within the meaning of section 301(a). Id. at 620-622.

Generally, and with important exceptions, there is a "national policy against judicial interference in the internal affairs of unions . . . ." Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10, 605 F.2d 1228, 1240 (2d Cir. 1979), cert. denied, 446 U.S.

919 (1980); <u>Gurton v. Arons</u>, 339 F.2d 371, 375 (2d Cir. 1964). A negotiated resolution of this internal dispute between a local and its national would have been preferable to a resolution through the judicial process.

At my urging, the parties agreed to participate in mediation before Professor John D. Feerick, a nationally recognized labor mediator. On May 25, 2004, I entered an Order deeming the pending motions for summary judgment, filed in February 2004, withdrawn without prejudice to refiling within 60 days, at which point it was contemplated that the mediation would result in a resolution or an impasse. Thereafter, I extended the time for re-filing the motions to December 31, 2004.

The parties participated in mediation in November 2004. Despite the efforts of the parties and those of the skilled mediator, no resolution was reached. Each side requested that its motion for summary judgment be deemed resubmitted and I have granted that request.

II.    SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c). In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." <u>Allen v. Coughlin</u>, 64 F.3d 77, 79 (2d Cir. 1995) (citation and quotation marks omitted); <u>accord</u> <u>Matsushita Electric Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986). However, when the moving party has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the

opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e).

It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of its claim or defense, demonstrating that it is entitled to relief. The evidence on each material element, if unrebutted, must be sufficient to entitle the movant to relief in its favor, as a matter of law. Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" as to a material fact. A fact is material if it "might affect the outcome of the suit under the governing law. . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. Thus, in order to survive summary judgment, plain-tiffs must come forth with more than a mere scintilla of evidence in support of their position; they must come forward with evidence "on which the jury could reasonably find for the plain-tiff." Id. at 252. "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. New York, 132 F.3d 145, 149 (2d Cir.), cert. denied, 524 U.S. 911 (1998). Where there is no dispute as to the material facts, summary judgment may be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof

at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). All reasonable inferences must be drawn against the non-movant.

III.    MOOTNESS

Defendant contends that plaintiff's claims are moot to the extent they concern the Pajewski, McLeod, Rodriguez and Jennings appeals described below, because each has completed their term of office, and because plaintiff and Rodriguez have settled their dispute relating to the unexplained hotel charges and he is no longer a member of the Local. No claim of mootness is asserted as to the appeal relating to Naomi Allen.

The mootness doctrine is mandated by the "case or controversy" requirement in Article III of the United States Constitution, and requires that federal courts not adjudicate matters that no longer present an actual dispute between parties. <u>See</u> <u>Lewis v. Cont'l Bank Corp.</u>, 494 U.S. 472, 477-78 (1990). A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." <u>Powell v. McCormack</u>, 395 U.S. 486, 496 (1969) (citation omitted). When "it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, [and] interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," the issue is moot. <u>Los Angeles County v. Davis</u>, 440 U.S. 625, 631 (1979) (citations and internal quotations omitted); <u>see also</u>, <u>e.g.</u>, <u>Van Wie v. Pataki</u>, 267 F.3d 109, 113 (2d Cir. 2001). As the Second Circuit noted in <u>Catanzano v. Wing</u>, "[t]he central question . . . is constant--whether decision of a once living dispute continues to be justified by a sufficient prospect that the decision will have an impact on the parties." 277 F.3d 99, 107 (2d Cir. 2001) (citing Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, 13A <u>Federal Practice & Procedure</u> §

3533 (2d ed.1984)).  If a case is moot, the federal court is divested of jurisdiction over the

matter.  Id. (citing Davis, 440 U.S. at 631).

       A plaintiff may, however, challenge a moot issue if the alleged error is "capa-

ble of repetition, yet evading review."  Olmstead v. Zimring, 527 U.S. 581, 594 n.6 (1999)

(citation and internal quotations omitted).  Thus, an otherwise moot issue is justiciable when

"(1) the challenged action was in its duration too short to be fully litigated prior to cessation

or expiration, and (2) there was a reasonable expectation that the same complaining party

would be subjected to the same action again."  Weinstein v. Bradford, 423 U.S. 147, 149

(1975).  The burden on defendant to demonstrate mootness is a "heavy one," United States v.

W.T. Grant Co., 345 U.S. 629, 633 (1953), and a defendant must establish that it is "abso-

lutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."

Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, 484 U.S. 49, 66 (1987) (citation

and internal quotations omitted).  "Speculative contingencies" on the part of plaintiff, how-

ever, "afford no basis for [ ] passing on the substantive issues."  Armstrong v. Ward, 529 F.2d

1132, 1136 (2d Cir. 1976) (citation and internal quotations omitted); see also Russman v.

Board of Educ., 260 F.3d 114, 120-21 (2d Cir. 2001).

       Plaintiff also asserts that its claims are not moot because it seeks monetary

damages in addition to injunctive and declaratory relief.  Where claims for damages or other

monetary relief remain, mootness is generally avoided.  See Havens Realty Corp. v. Coleman,

455 U.S. 363, 371 (1982); see also 13A Wright Miller & Cooper, Federal Practice and Proce-

dure: Jurisdiction 2d §3533.3 at pp. 261-62 (1984 & 2001 Supp.) ("Claims for damages or

other monetary relief automatically avoid mootness, so long as the claim remains viable").

Even if the "amount at issue is undeniably minute . . . as long as the parties have a concrete

interest, however small, in the outcome of the litigation, the case is not moot." Ellis v. Broth-
erhood of Railway, Airline & Steamship Clerks, Freight Handlers, Express & Station Em-
ployees, 466 U.S. 435, 442 (1984) (citation omitted); see also Ellis v. Blum, 643 F.2d 68, 82-
84 (2d Cir.1981) (finding that although plaintiff's claims for injunctive and declaratory relief
were mooted, a live damages claim for $1500 "save[d] the action from the bar of mootness").

The Complaint contains a "Prayer for Relief" that seeks "declaratory judgment,
concerning each of the Appeals Committee decisions . . . .," an order vacating the decisions
and reinstating the decisions of the Local, "compensat[ion] for [plaintiff's] losses by payment
of litigation expenses and attorneys fees" and "such other and further relief as is just and
proper." (Complaint p. 14) Immediately preceding the "Prayer for Relief" is a section head-
ing in boldface and underscored: "Damages." In the "Damages" section, plaintiff alleges that
"Defendants' [sic] actions have caused Local 100 to lose funds, including the payment of
backpay and the cost of publishing International decisions." (Complaint ¶ 42) In its brief in
opposition to summary judgment, plaintiff expands on this allegation asserting that it seeks to
recover "money Local 100 was forced to pay to Rodriguez after he was improperly reinstated
to office, money Local 100 was forced to pay to Jennings after he was improperly reinstated
to office, the costs of publishing the retractions that Defendant ordered Plaintiff to publish in
the Allen case and compensation paid by Local 100 to Pajewski and McLeod after they were
elected Division Chair and Vice Chair." (Pl. Opp. Mem. at 18-19) While the placement of
the "Damages" allegation before – and not within – the "Prayer for Relief" is needlessly con-
fusing, I cannot say that plaintiff has not alleged a claim for monetary relief.

Of course, a plaintiff "cannot avoid having the complaint dismissed as moot"
where damages, even if alleged, are not available as a matter of law. Omnipoint Communica-

tions, Inc. v. City of White Plains, 175 F. Supp. 2d 697, 706 (S.D.N.Y. 2001). Section 301 of the LMRA, however, contemplates that monetary damages will be available to certain plaintiffs under certain circumstances. 29 U.S.C. § 185(b) ("Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets.") In concluding that a local may sue the parent union for an alleged violation of the union's constitution, the Supreme Court held that the constitution is deemed a contract within the meaning of section 301(a) and added that "[n]othing in the language and legislative history of § 301(a) suggests any special qualification or limitation on its reach, and we decline to interpose one ourselves." Local 334, 452 U.S. at 624-25. The same observation would appear to apply to the availability of money damages for breach of such a contract.[1] I cannot conclude that, as a matter of law, a local union is precluded from recovering out-of-pocket losses from the national union. Because the claim for monetary relief renders plaintiff's claims justiciable, I need not decide whether the "capable of repetition, yet evading review" exception to the mootness doctrine applies.

---

[1]    In Local Union No. 38 v. Pelella, 350 F.3d 73 (2d Cir. 2003), cert. denied, 541 U.S. 1086 (2004), the Court affirmed an award of nominal damages of $1 to an individual union member in a suit against his local for violation of the union constitution and rights under the LMDRA. A punitive damage award of $25,000 was premised solely on a violation of the LMDRA. 350 F.3d at 86. While the Court did not have occasion to address the availability of compensatory damages for a violation of a union constitution, Pelella stands as support for the proposition that an individual union member may recover at least nominal damages against his or her union in part on a theory that the union violated its own constitution. I note that the district court in Guzman v. Bevona, 1995 WL 110584 (S.D.N.Y. Mar. 15, 1995), decided prior to Pelella, looked to the relevant union constitutions to determine whether monetary damages were available, finding that "[n]either constitution provides explicitly for monetary damages, and parties to the contract would in all probability have explicitly stated such course for remedy had this type of relief been contemplated." Id. at *8.

IV.      NO REASONABLE JURY COULD FIND THAT THE TWU'S
            DECISIONS WERE PATENTLY UNREASONABLE OR IN BAD FAITH

"Courts adhere to the longstanding policy against intervention in the internal affairs of unions, which are best left to the officials chosen by the members to manage those operations except in the very limited instances expressly provided by [statute]." Monaco v. Smith, 2004 WL 203009, at *4 (S.D.N.Y. Feb. 2, 2004) (quoting Newman v. Local 1101, Communications Workers of America, AFL-CIO, 570 F.2d 439, 446 (2d Cir.1978)).  As the Second Circuit has recognized:

> Courts have no special expertise in the operation of unions which would justify a broad power to interfere.  The internal operations of unions are to be left to the officials chosen by the members to manage those operations except in the very limited instances expressly provided by the [LMRA] . . . General supervision of unions by the courts would not contribute to the betterment of the unions or their members or to the cause of labor-management relations.  Gurton v. Arons, 339 F.2d 371, 375 (2d Cir. 1964) (quoted in Mason Tenders Local Union 59 v. Laborers' International Union of North America, AFL-CIO, 924 F. Supp. 528, 543 (S.D.N.Y.), aff'd, 101 F. 3d 686 (2d Cir. 1996)).

Thus, a federal court is not a general forum for final review of decisions of union executive boards.

The power of an international union is granted and defined in the union's constitution, and a union's interpretation of its own constitution and other governing documents is entitled to great deference.  In its limited review the Court will uphold a union's interpretation unless it is patently unreasonable or made in bad faith.  See, e.g., Sim v. New York Mailers' Union Number 6, 166 F.3d 465, 470 (2d Cir. 1999) ("[T]he interpretation of bylaw provisions by Union officials will be upheld unless patently unreasonable.") (citations and internal quotations omitted); Hill v. Chao, 229 F. Supp. 2d 227, 232 (S.D.N.Y. 2002); Weiss v. Torpey, 987 F. Supp. 212, 220 (E.D.N.Y. 1997); Mason Tenders, 924 F. Supp. at 543-44.  As one

Court noted in a similar action against the TWU, "[w]hile the unfortunate political animosity pervading this intra-union battle is deep, the legal issue before [this Court] is narrow, namely whether the Union's interpretation of the TWU Constitution is patently unreasonable." Executive Bd. Of Transport Workers Union of Philadelphia, Local 234 v. Transport Workers Union of American, AFL-CIO, 338 F.3d 166, 176 (3d Cir. 2003). It is the party challenging the union action that bears the burden of demonstrating that the union's interpretation of its governing documents was "patently unreasonable." Id. at 169-70.

A.    The Decisions Are Not Patently Unreasonable

A union's constitution "is a flexible instrument that . . . entrusts to the president plenary authority to do whatever is necessary to protect the interests of the membership." Famulare v. United Transp. Union Int'l, 639 F. Supp. 965, 969 (S.D.N.Y.1986).

As the Third Circuit recognized in its Local 234 decision, although "patently unreasonable" has never been precisely defined, "the standard is undeniably a high one as [c]ourts are reluctant to substitute their judgment for that of union officials in the interpretation of the union's constitution, and will interfere only where the official's interpretation is not fair or reasonable . . . . [A]n interpretation that conflicts with the stark and unambiguous language of the Constitution or reads out of the Constitution important provisions is a patently unreasonable interpretation of a union Constitution." Local 234, 338 F.3d at 170 (internal citations and quotations omitted); see also Stelling v. Int'l Bhd. of Elec. Workers, 587 F.2d 1379, 1389 n.10 (9th Cir. 1978), cert. denied, 442 U.S. 944 (1979). "In other words, the critical question, uniformly, is whether the stated reason for the action was facially sufficient under the instrument of governance, or put another way, whether there was arguable authority for the officer's act from the officer's viewpoint at the time . . . If this query is answered in the

affirmative, further judicial scrutiny of the decision, absent bad faith, is foreclosed." Local No. 48, 920 F.2d at 1052 (citation and internal quotations omitted) (footnote omitted).  "To uphold the union's action in interpreting the contract as it did it is not necessary that we find on the merits that such an interpretation was correct.  Rather, our inquiry is limited to whether the union took a position on the basis of an informed, reasoned judgment regarding the merits of the [] claim in light of the language contained in the [governing documents]." Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 127 (2d Cir. 1998), cert. denied, 526 U.S. 1017 (1999) (citation and internal quotations omitted).

Absent a showing that the TWU's interpretations of its Constitution were patently unreasonable, plaintiff must demonstrate that the TWU's actions were taken in bad faith. Bad faith has been found to exist where union officials acted "contrary to the International's best interests, out of self-interest, or in an unconscionable or outrageous way." Local 48, 920 F.2d at 1055 (quoted in Mason Tenders, 924 F. Supp. at 546).  Bad Faith may be shown if plaintiff demonstrates that the union official who made the decision did so based on "some interested or sinister motive." Int'l Bhd. of Teamsters v. Local 810, 19 F.3d 786, 794 (2d Cir. 1994); Mason Tenders, 924 F. Supp. at 548 ("The inquiry into bad faith should be employed where there is evidence that a union official had a 'sinister motive' or intent to benefit personally, such as some pecuniary gain.") (citation omitted).

Plaintiff in this case does not argue that any decision of the IAC  "conflicts with the clear and unambiguous language in the Constitution, ignores the plain terms of the Constitution, [or] reads important provisions out of the Constitution." Local 234, 338 F.3d at 174.  Plaintiffs point to no provision of the Constitution that they allege the IAC has contravened in its decisions. Compare Loretangeli v. Critelli, 853 F.2d 186, 195 (3d Cir. 1988) (un-

ion's "interpretation . . . [is likely] 'patently unreasonable' because it reads out of the constitution an important protective provision" where "plaintiffs point to a specific constitutional provision which, by its terms, prohibits the defendants' actions") (citation omitted). Instead, plaintiff argues that the TWU's decisions were patently unreasonable because the TWU improperly interpreted the Local By-laws, because other interpretations were available or because the decisions appear politically motivated. In the alternative, plaintiff argues that there is a genuine issue of material fact as to whether defendant's actions were taken in bad faith.

        1.  <u>The Pajewski and McLeod Appeals.</u>

In its initial moving papers, defendant asserted that the Labor Management Reporting & Disclosure Act (the "LMRDA"), 29 U.S.C. § 482(a), required dismissal of plaintiff's action with respect to the Pajewski and McLeod appeals because "only the Secretary of Labor has authority to sue over an already conducted election." (Def. Mem. at 25) The LMRDA provides jurisdiction to the Secretary of Labor only with respect to the election of union "officers," which is defined in the statute as including only the union's president, vice president, secretary, treasurer, members of the union's executive board, persons performing "other executive functions," and anyone defined as an officer in the union's constitution. 29 U.S.C. § 402(n). The positions held by Pajewski and McLeod that are the subject of plaintiff's current action – division chair and division vice-chair – do not fall within the definition provided by statute or the TWU Constitution. The TWU argued as much – successfully – in a separate case it brought against Local 100. <u>See</u> Transcript of August 3, 2004 Argument and Partial Judgment dated August 6, 2004 in <u>Transport Workers Union of America, AFL-CIO v. Transport Workers Union of Greater New York, Local 100</u>, 04 Civ. 5210 (LAK).

In and around August 2000, the Local 100 membership voted to amend the Local 100 By-laws to provide: "A member who runs for the office of President, Secretary-Treasurer, Recording Secretary or Vice President of the Local shall not be permitted to run for a Division or Section Office." Joe Pajewski and Eddie McLeod ran in the December 2000 elections for the positions of Local 100 Secretary-Treasurer and Vice President, respectively. (Complaint ¶¶ 12-13) According to plaintiff, Pajewski and McLeod are politically aligned with Sonny Hall and his supporters in the TWU. Neither Pajewski nor McLeod were successful in their bid for elected office. In the same elections, James Oddo and Earl Kelly ran for, and were elected, Chair and Vice-Chair of the Local's Structure Division. (Complaint ¶ 14) Fifteen days after the election and prior to being sworn into office, however, Oddo and Kelly resigned from their elected positions. The Structure Division subsequently held a meeting on February 7, 2001, to nominate candidates to fill the vacated positions. Pajewski and McLeod were nominated for Chair and Vice-Chair. Another member of the Local 100 submitted an objection to their nomination, citing the recently amended By-law. Faced with the objection, the Local's Election Committee determined that Pajewski and McLeod were eligible to run for the offices, deeming the election a new election, held after the general election in which they stood as candidates for Secretary-Treasurer and Vice President. At a later meeting, the Local's Executive Board disagreed and voted to disqualify Pajewski and McLeod by a vote of 26 to 12.

Pajewski and McLeod appealed the decision of the Local Executive Board to the TWU's IAC. The IAC voted to reverse, and ruled that the two were eligible to run in the Structure Division election. It found that the Local Executive Board's interpretation of its By-law as prohibiting a member who has run for a Local-wide office from running for a Division

office in a subsequent election conflicted "with the democratic principles underlying the TWU Constitution" and that the "exercise of the fundamental right to run for Local-wide office by a member cannot result in his later forfeiting other rights that he would plainly otherwise have had, such as the right to run for a vacant Division office." (Def. Ex. 26) Local 100 appealed the IAC's decision to the October 2001 TWU Convention, which denied the appeal. Pajewski and McLeod were elected Divisional Officers, and, during the pendency of this action, they completed their terms in December 2003.

The TWU's interpretation was not patently unreasonable. At the time Pajewski and McLeod stood for Divisional office, they were not then candidates for "President, Secretary-Treasurer, Recording Secretary or Vice President." Their candidacy was over. They had run and lost. The words of the By-law, reasonably read, would mean that a candidate may not simultaneously stand for election for a senior officer position of the Local and also a Divisional or Sectional office. The fact that vacancies for Divisional office arose by reason of resignations occurring shortly after their candidacies for Local-wide office had ended does not alter the result. It is not the function of this Court to interpret the TWU's Constitution. I need only conclude, as I do, that no reasonable fact-finder could find that the TWU's interpretation was patently unreasonable. Although not necessary to my ruling, I note that Local 100's own Election Committee (before it was overruled by the Local's Executive Committee) reached the exact same conclusion: that the Local's By-law should be construed to permit Pajewski and McLeod to run for Divisional Office following their defeat in the election for Secretary-Treasurer and Vice President.

 2. The Rodriguez Appeal.

In 2000, Local 100 hired an accountant and a law firm to investigate alleged credit card misuse by its officers. In the course of the investigation, the lawyer conducting the review met with Gil Rodriguez, a Local 100 Vice President, and presented him with a list of his credit card charges. According to plaintiff, Rodriguez is politically aligned with Sonny Hall and his supporters in the TWU. Of some $40,000 in non-hotel related charges made on the union credit card over four years, Rodriguez was unable to document $1,795.35 of the charges. Local 100 subsequently requested payment of that amount, plus interest, from Rodriguez, and asked him to explain his hotel-related charges.

In May and June 2001, disciplinary charges were issued against Rodriguez for failing to comply with the Local's request for payment and additional information. In January 2002, Rodriguez paid the amount owing, but did not provide an explanation as to the hotel charges. A Trial Committee of the Local decided to conduct a hearing, and in May 2002 found that Rodriguez had failed to explain any of his hotel-related charges, which totaled $13,636.73. They concluded that the credit card charges therefore "did not have a union-related purpose" and recommended that he be ordered to pay the $13,636.73, be removed from his union office, and suspended from Local 100 membership for three years. (Def. Ex. 40) Local 100's Executive Board adopted the trial committee's recommendations, and Rodriguez appealed the decision to the IAC.

On August 12, 2002, while the internal union appeal was pending, Local 100 filed a lawsuit against Rodriguez and other former Local 100 officers seeking the amount

owed in connection with the alleged credit card misuse.  <u>Toussaint v. Hall</u>, 02 Civ. 6403

(PKC).[2]

On August 16, 2002, the IAC issued a decision in Rodriguez's appeal.  The

IAC agreed that Rodriguez had violated the TWU Constitution by failing to explain his hotel-

related expenses, but restored him to his position as Local Vice President following a two-

month unpaid suspension and concluded that he need not pay interest on the amount re-paid

for non-hotel related charges because the violation was cured and "the Local was not particu-

larly active in pressing [him] for" information.  The IAC also ruled that "any discipline with

regard to the alleged impropriety of the hotel related expenses be put in abeyance until the

federal case is completed, at which time this matter may be reconsidered in light of the find-

ings of the court."  (Def. Ex. 42)  Rodriguez has since retired from Local 100.

The scope of discipline to be imposed upon Rodriguez was a matter of judg-

ment based, in part, upon experience in such matters.  It also stood to some degree on whether

there had been evidence of a defalcation or, rather, of a failure to provide requested and re-

quired documentation.  The IAC placed some weight on the Local's own record in requesting

documentation from him.  The IAC reached the conclusion that a two-month suspension cou-

pled with a decision to hold further discipline in abeyance pending the outcome of the sepa-

rate lawsuit against Rodriguez was not patently unreasonable.  As noted, Rodriguez retired.

There is no basis on this record for a reasonable fact-finder to conclude that the actions of the

IAC or the defendant were patently unreasonable in the case of the Rodriguez appeal.

3.  <u>The Allen Appeal.</u>

---

[2]    The claims against Rodriguez were settled by stipulation and order of dismissal dated June 14, 2004.

In preparation for the October 2001 TWU Convention, the New Directions faction chose a slate of candidates to nominate to serve as delegates from the Local 100's Car Maintenance Division.  Although Naomi Allen was a New Directions member, she chose to nominate a competing slate of candidates, a move that was condemned by New Directions leader Toussaint.  On May 30, 2001, Allen withdrew her slate of candidates.  A Local 100 staff member, Marc Kagan, subsequently filed internal union disciplinary charges against Allen, claiming that at the May 23, 2001 Car Maintenance Division meeting, Allen had forged the names of three members of her slate on letters accepting their nominations.  The Local's rules governing the nomination of delegates provide:  "Each nominee must either be present at the nominating meeting to register his/her acceptance of the nomination, or the person nominating him/her must submit a written acceptance at the meeting.  Either at the meeting or within two days . . . after the meeting, each nominee is required to sign and have filed with the Elections Committee an official acceptance form."  (Ex. 46)

The Local 100 Executive Board assigned the charges to be heard by a three-member Trial Committee.  After hearing testimony from Allen, two of the three members of the Trial Committee voted that the charges against Allen be dropped.  One member dissented, issuing a "Minority Report" recommending that Allen be censured.  The Local Executive Board chose to recommend acceptance of the Minority Report.  The Executive Board did not review a transcript of Allen's testimony or provide an explanation for why it was rejecting the recommendation of the Trial Committee.  (Toussaint Dep. at 174-75; Complaint Ex. I at 2). The Executive Board ruled that Allen should be publicly censured.

Allen appealed to the IAC, which reversed in a decision dated August 23, 2002.  In reversing the Executive Board's decision, the IAC rejected, inter alia, the Executive

Board's finding that Allen had intentionally tried to pass off her handwriting as that of the potential candidates, finding insufficient evidence of Allen's intent to deceive. The IAC also criticized the Executive Board's decision to punish Allen for defending what she had done rather than "admitting error," finding that the decision "subverts the right to defend oneself . . . by punishing her for daring to defend herself." (Complaint Ex. I) Finally, the IAC criticized the Executive Board for failing to "carefully explain the evidentiary factors which led it to" reverse the Trial Committee's finding that the charges against Allen should be dropped. (Id.)

There is no dispute that Ms. Allen affixed the signatures of the three individuals on the form she submitted at the nominating meeting. She claimed she did so because she believed she was authorized to do so, and indeed, the text of the Local By-law does not seem to prohibit a third party from submitting a written acceptance on behalf of a nominee at the nominating meeting, if the nominee signs and files an official acceptance form after the meeting. All three of the nominees supported Allen's claim of authorization either through letters (in the case of two) or appearance at the Trial Committee hearing (in the case of the third). The IAC's determination that there was insufficient evidence of any intent to deceive by Allen was not patently unreasonable under the circumstances. In opposition to summary judgment, plaintiff has come forward with no evidence of Allen's intent to deceive other than that which was considered by the Trial Committee and the IAC—the purported variations in the styles of the three signatures. The issue is not whether there were issues of fact before the Trial Committee but, rather, whether there is a triable issue of fact over the patent unreasonableness of the ultimate resolution by the defendant's IAC. It requires no fact finding on the part of the Court to conclude that a mere difference in opinion as to whether the signatures

appear to be in the same writing or appear to vary does not render the IAC's decision patently unreasonable.

Nor was it patently unreasonable for the IAC to express the opinion that Allen was entitled to offer a defense to the charges against her without the vigor of that defense being held against her on whether the charge should be sustained, or for the IAC to expect that the Executive Board set forth its basis for rejecting the trial committee's recommendation and adopting the Minority Report.  Because the Executive Board's decision does not indicate that Allen's lack of remorse was considered only with respect to the punishment imposed, and not with respect to the issue of guilt, the IAC's decision was not patently unreasonable.  And although it is true, as plaintiff argues, that the Local Executive Board adopted the text of the Minority Report as its own, it is undisputed that it stated no independent reasons for doing so.  In prior decisions, the IAC had made clear that "[w]hile the Executive Board does have the power not to accept the recommendations of Trial Board, we believe that when it choose [sic] to do so, it must justify its decision with a detailed recitation of the record evidence which led it to its conclusions."  (Bakalo Ex. H)  Plaintiff's contention that "the reasons for the Executive Board's decision are clear" does not render the IAC's requirement that it independently state its reasons for rejecting the Trial Committee's recommendation in favor of the Minority Report unreasonable.  Finally, while not dispositive, I note that a two-person majority of the Local's Trial Committee was inclined to reach a result similar to that of the IAC, albeit for different reasons.  Taken as a whole, no reasonable fact-finder could conclude that the IAC's decision on the Allen appeal was patently unreasonable.

4. <u>The Jennings Appeal.</u>

In summer 2002, in apparent defiance of certain leaders of Local 100, Queens bus drivers represented by Local 100 went on strike. During the strike, Toussaint criticized a Local 100 Vice President, George Jennings, stating that he believed Jennings had "used his influence improperly" in causing the Local's Negotiating Committee to call the strike. Two members of the Local brought charges against Jennings, alleging that he disrupted a member-ship meeting on July 14, 2002 by, among other things, using "foul language" and undercutting positions advocated by the Local's Executive Board.

Specifically, the charges alleged that Jennings's actions in urging members of the Queens Private Lines Division of Local 100 to secede from the Local violated Article XIX(o) of the TWU Constitution by "prejudicing or damaging the interests and welfare of [a] Local." At an October 9, 2002 meeting, the Local's Executive Board decided to conduct a hearing of the charges against Jennings as a committee of the whole rather than appointing a three-person Trial Committee dictated by certain provisions of the TWU Constitution. (Def. Ex. 68; <u>see also</u> TWU Const. Article XX (Complaint Ex. A at 63) (when a Local's Executive Board believes charges warrant a trial, it "shall elect a Trial Committee of three members in good standing" to hear the case)) The Local's Executive Board did not suspend Jennings from office pending the hearing. On November 12, 2002, at the conclusion of the second day of "trial," the Executive Board found that Jennings had violated the TWU Constitution and the Local 100 By-laws. On January 17, 2003, the Executive Board decided to remove Jennings from his position and suspend him from membership. (Def. Ex. 70) The Executive Board made no stenographic record of the "trial," but did videotape the proceeding. (Ex. 69; Toussaint Dep. at 245-46)

Jennings appealed the Executive Board's decision to the IAC. Because the Executive Board had not complied with Article XX of the Constitution, which requires, in addition to the appointment of a Trial Committee, that the Trial Committee "report its findings and recommendations" within seven days of a hearing (Complaint Ex. A at 64), the IAC assumed that the Executive Board was proceeding pursuant to Article XXI of the TWU Constitution. Article XXI permits the Executive Board to suspend an officer if it provides a written statement of the reasons for the suspension within five days, holds a hearing on the suspension within 15 days, makes a stenographic record of the hearing and gives a copy to the suspended officer, and provides that "[u]pon the conclusion of such hearing the Board . . . shall decide whether the evidence warrants removal of the officer and shall either reinstate the accused to his/her office or remove him/her from his/her office, or may take other appropriate action." (Complaint Ex. A at 66-67)

The IAC concluded that the Executive Board "attempted to create a procedure that was a hybrid combining elements of Article XX and elements of Article XXI" but had succeeded in complying with neither. As noted, the Executive Board did not comply with Article XX, Section 4 because it did not issue a decision within seven days of the conclusion of the hearing—its sanction was imposed more than sixty days later.

The IAC gave the Local the benefit of the doubt that they could properly proceed under Article XXI of the Constitution, but then found that the Local failed to comply with those provisions. The IAC concluded that the Local did not comply with Article XXI's requirement that Jennings be provided with a stenographic record of the proceedings, and failed to issue its decision at "the conclusion of the hearing." Although plaintiff argues that "Robert's Rules of Order" permitted the procedure used without reference to any Constitu-

tional requirements, plaintiff also admits that those rules are followed only "in the absence of a clear Constitutional or By-Law provision to the contrary." (Pls. Mem. at 19) Here, the Constitution clearly provides alternate methods for disciplining a local official: either by trial before a three member Trial Committee pursuant to Article XX, or suspending the official pursuant to the procedures outlined in Article XXI. The IAC ruled that if the Executive Board wished to proceed against Jennings, it must do so in a manner authorized in the Constitution: if heard by the Trial Committee, then compliance with Article XX is required; if suspension or removal is to be imposed by the full Board, then compliance with Article XXI is required. The IAC therefore restored Jennings to membership in the Union and to his elected office. Shortly thereafter, Local 100 suspended Jennings on different grounds, and he never returned to work. His term as Vice President expired in any event in December 2003, during the pendency of this action. (Toussaint Dep. 231-36)

      The IAC's ruling that Article XX applies only to a three-person Trial Committee and not to a hearing by the full board was not patently unreasonable. The plain language of Article XX requires a three-member committee: "the Local Executive Board shall elect a Trial Committee of three members." The accused member is permitted to challenge any member of the Trial Committee on the ground that he is interested in the subject matter and to have his challenge heard by the Executive Board. (Article XX, Sec. 3) Indeed, Article XX requires that the Trial Committee's findings be reviewed by the Local Executive Board and it would not be a patently unreasonable interpretation to conclude that a member would be deprived of the second level of review if the two steps were conflated.

      Nor was it patently unreasonable for the IAC to require that that the procedures set forth in Article XXI be followed where the full Executive Board chooses to act. Article

XXI requires that a stenographic record be made of the proceedings and provided to the suspended officer, and that "[u]pon the conclusion of [the] hearing, the Board . . . shall decide whether the evidence warrants removal of the officer and shall either reinstate the accused to his/her office or remove him/her from his/her office, or . . . take other appropriate action."  It is not patently unreasonable for the IAC to require adherence to the procedural requirements set forth in the TWU's Constitution.  True, videotape may have certain value in capturing the demeanor of a witness but a written transcript provides a verbatim account of the proceedings that aids in the appellate review process by permitting the parties and the tribunal to readily focus upon a portion of the record by citing to the page and line of the relevant testimony.  I note that courts, either by custom or rule, often require that proceedings be stenographically transcribed.  Cf. 28 U.S.C. § 753 (noting the rule making authority of the Judicial Conference and the required approval of the judge for the method of making a verbatim record).

Article XXI also unambiguously provides that "[u]pon the conclusion of such hearing" the executive board shall decide the case.  It may remove or reinstate the officer or take other action.  Here, the Local's Executive Board concluded on November 12, 2002 that the charge was proven but did not decide upon the sanction until January 17, 2003.  By deviating from that which the TWU's Constitution required in the case of an Article XXI proceeding, an executive board of a local would create an ambiguity as to when the charged officer's right to appeal (which must be exercised within thirty days) begins to run. (Article XXII, Sec. 3)  No reasonable fact-finder could conclude that it was patently unreasonable for the TWU to require strict compliance with the text of its Constitution or that the IAC acted in a patently unreasonable manner in ruling that the Executive Board in the Jennings case failed to comply with either Article XX or Article XXI.

Finally, plaintiff offers no evidence to support its conclusory assertion that the IAC's decision in the Jennings appeal was inconsistent with prior IAC decisions. Specifically, it offers no evidence of prior IAC rulings rejecting an argument based upon the same grounds as asserted in the Jennings appeal. The Local's contention, therefore, provides no basis for me to conclude that the IAC's decision was patently unreasonable.

B.      The Absence of Evidence of Bad Faith

Plaintiff may prove that a decision of the TWU was made in bad faith by demonstrating that a decision was contrary to the International's best interests or was unconscionable or outrageous. Local 810, 19 F.3d at 794; Local 48, 920 F.2d at 1055. As one court has noted, establishing that an action is not in the best interests of particular members, or the union members generally, is not sufficient: "The standard set forth by the First Circuit in Local 48 and adopted by the Second Circuit in Local 810 defines bad faith as actions contrary to the best interests of the international, not the rank-and-file." Mason Tenders, 924 F. Supp. at 546. Because "[a]lmost every union determination . . . is likely to be opposed by some groups and officials . . . the inquiry into bad faith should be employed [only] where there is evidence that a union official had a 'sinister motive' or intent to benefit personally, such as some pecuniary gain." Id. at 547-48 (citation omitted). To establish bad faith, plaintiff must come forward with more than conclusory accusations and suppositions. Local 810, 19 F.3d at 794.

Plaintiff has come forward with no evidence that would permit a reasonable jury to find that the TWU acted in bad faith with respect to any of the appeals at issue. The conclusions reached on the appeals do not evince bad faith. In each instance, the IAC provided a written statement of the reasons for its ruling. This permits a reasonable degree of transparency in the process by permitting the reasons to be measured against both the text of

the Constitution and the prior rulings of the IAC. The IAC does not have the last word. If a

decision is reached by a unanimous ruling it may be appealed to the next International Con-

vention, or the International Executive Council ("IEC") may review it on its own motion. (Ar-

ticle XXII, Sec. 1)  If the decision is not unanimous (all decisions challenged here were

unanimous), then it may be appealed to the IEC and eventually to the full Convention.  (Id.)[3]

There are no allegations and no evidence that any IAC member benefited per-

sonally from the decisions rendered, or that any decision was against the best interests of the

TWU or was unconscionable or outrageous.  Allegations of political motivations on the part

of TWU President Sonny Hall do not create a triable issue of fact, in part because plaintiff

cites no evidence that Hall played a role in the IAC's decisions in the four appeals at issue.

Plaintiff argues that bad faith is established through TWU's "past practices" or "track record."

Plaintiff argues that "evidence that a union decision follows established custom might serve to

strengthen the decision's inherent reasonableness and, by like token, evidence that a union

decision constitutes a radical break from uniform past practice might undermine its seeming

plausibility."  Dow v. United Bhd. Of Carpenters & Joiners of America, 1 F.3d 56, 59 (1st

Cir. 1993) (quoted in Pl. Opp. Mem. at 4-5).  In opposing summary judgment, plaintiff asserts

that "each of the four TWU decisions at issue in this action represents a radical break from

Defendant's prior practice, providing strong evidence of the TWU's unreasonableness and

bad faith."  Pl. Opp. Mem. at 5.  The evidence submitted by plaintiff in opposition to defen-

---

[3]    As noted, Local 100 did, in fact, appeal the IAC's decision on the Pajewski/McLeod matter to the 2001
Convention, and that appeal was denied.  (See Def. Exs. 27, 28)  With regard to the three other appeals at is-
sue, there is no evidence in the record that review of the IAC's decisions was sought.  This raises an issue as
to whether plaintiff properly exhausted its remedies within the union structure.  Since neither party has
raised the exhaustion issue in their respective motions, the Court declines to reach it.

dant's motion, however, does not support this proposition, and plaintiff has failed to create a triable issue of fact precluding summary judgment on the issue of bad faith.

In the end, plaintiff's bad faith argument rests on its belief that the TWU's decisions were politically motivated. (Pl. Mem. at 4) ("Each of the [four appeals decision] is an example of an improper, politically motivated effort on the part of [] TWU to prevent Local 100's current administration from legitimately managing its own affairs . . . .") The mere fact that persons are politically opposed to one another, without more, is insufficient to create a triable issue of fact on bad faith. There is no evidence of political pressure or coercion directed to the members of the IAC. The record is barren of facts, as distinguished from surmise and theory, to support a conclusion that the members of the IAC were improperly influenced in their decision making.

V.    CONCLUSION

For the reasons set forth herein defendant's motion for summary judgment dismissing plaintiff's complaint is GRANTED. The Clerk is directed to enter judgment in favor of defendant.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       September 13, 2005